## THE UNITED STATES BANKRUPTCY COURT FOR THE
## DISTRICT OF NEBRASKA

In Re:

PLANET MERCHANT PROCESSING, INC.,

        Debtor.

Case No. 16-81243

(Chapter 11)

---

EVO MERCHANT SERVICES, LLC (f/k/a
MERCHANT SERVICES, INC.),

        Plaintiff,

v.

PLANET MERCHANT PROCESSING, INC.,
Chapter 11 Debtor, and PLANET GROUP,
INC., and WEST PARTNERS, LLC, and
DENNIS M. O'BRIEN,

        Defendants.

Adv. No. _____

**VERIFIED ADVERSARY
COMPLAINT**

---

**COMES NOW** Plaintiff, EVO Merchant Services, LLC (f/k/a Merchant Services, Inc.)

("EVO"), and, for its Complaint against the Defendants, states and alleges as follows:

### NATURE OF THE PROCEEDING

This is a proceeding to address wrongs committed against EVO by the Debtor and the

other Defendants.  The Defendants have acted in a coordinated, orchestrated fashion to threaten

EVO with non-performance under a contract between EVO and the Debtor and to seek to extract

exorbitant sums of money from EVO merely in exchange for permitting the Debtor to continue

to perform under an existing, valid contract with EVO.  Further, when EVO refused this effort to

extort, the Defendants acted further to inflict retributive harm on EVO by the needless filing for

chapter 11 bankruptcy, seeking rejection of the Debtor's contract with EVO, and then unilaterally terminating all performance under the contract.  The Debtor's termination of performance is in defiance of two directions from the Bankruptcy Court: the Bankruptcy Court's direction from the bench at an August 25 status conference in which the Debtor asked for and was denied permission to cease performance under the contract, and the Bankruptcy Court's order granting EVO's *Verified Emergency Motion for Order to Compel Compliance with Court's Instructions from August 25, 2016 Hearing*, entered by the Court on August 29, 2016.  The Debtor takes the position that it is not obligated to provide services under its customer contracts, despite the Bankruptcy Court's rulings.  EVO seeks damages for multiple causes of action set forth below, specific performance of its contract with the Debtor, a finding of alter ego against the non-Debtor Defendants, and injunctive relief as to all parties to avoid irreparable harm to EVO and EVO's 160,000 U.S. merchants who rely on EVO and the Debtor's continued performance under EVO's contract with the Debtor.

## JURISDICTION AND VENUE

1.      This case presents both core claims as well as noncore claims that are related to this Chapter 11 Case.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1334. This dispute is brought as an adversary proceeding pursuant to Fed.R.Bankr.P. 7001(1), (7), and (9).

2.      Venue in the District of Nebraska is proper because the Chapter 11 Case is pending in this Court.

## PARTIES

3.     Plaintiff EVO is a limited liability corporation, having its principal place of business in Melville, New York, and is organized and existing under the laws of the State of Delaware.

4.     Defendant Debtor ("Debtor") is a corporation with its principal place of business in Omaha, Nebraska, and is organized and existing under the laws of the State of Nebraska.

5.     The Debtor is a debtor-in-possession in the above-captioned Chapter 11 case (the "Chapter 11 Case").  The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on August 17, 2016, and continues to operate its businesses as debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108.

6.     Defendant Planet Group, Inc. ("PGI") is a corporation with its principal place of business in Omaha, Nebraska.  The Debtor is a wholly owned subsidiary of PGI.

7.     Defendant West Partners, LLC ("West Partners") is an investment firm with its prinicipal place of business in San Diego, California.  West Partners owns not less than a majority of the equity interest of PGI.  This Court has specific jurisdiction over West Partners because West Partners purposely directed the conduct described herein to the State of Nebraska with knowledge that the consequences of its conduct would be felt in this forum and, through its relationship with the Debtor and PGI, regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from the goods used or consumed or services rendered in this State.

8.     Defendant Dennis M. O'Brien is an individual who, upon information and belief, resides in San Diego, California.  Mr. O'Brien is president of the Debtor, president and/or

chairman of PGI, and a principal and founding partner of West Partners.  This Court has specific

personal jurisdiction over Mr. O'Brien because he purposely directed the conduct described

herein to the State of Nebraska with knowledge that the consequences of his conduct would be

felt in this forum and, through his relationship with the Debtor and PGI, regularly does or solicits

business and engages in a persistent course of conduct in this State.

## ALLEGATIONS COMMON TO ALL COUNTS

### *Overview of EVO's Business*

9.       EVO provides electronic payment processing products and services that enable

merchants—including over 160,000 in the U.S. alone—to accept credit and debit card payments

from their customers.  In essence, EVO's products and services allow merchants to connect,

through various technology-driven platforms and solutions, to card networks such as Visa,

MasterCard, Discover and American Express (collectively, the "Card Networks") and their

issuing banks.

10.      The "back end" settlement process is a critical element of the services provided

by EVO.  The process initiates a payment by the cardholder's issuing bank for the goods or

services purchased by the merchant's customer and, through a series of electronic funds

transfers, enables the merchant to receive payment for the goods and services sold through an

electronic deposit made to the merchant's bank account.  A properly functioning back end

settlement system is absolutely crucial for the processing of debit and credit card transactions to

ensure that EVO and its merchants are properly paid on a timely basis.

11.      While simple in concept, these back end settlement services (including fund

transfers) are provided through complex technology platforms that must be capable of processing

millions of transactions during any given day, while at the same time applying thousands of

4

different fee parameters and algorithms to ensure that the various participants in any given transaction are properly charged or paid, as the case may be, for each transaction.  To add to the complexity, these back end platforms are constantly evolving to accommodate changes in the payment industry, whether mandated by new legislation or regulations, the promulgation of new rules mandated by the Card Networks, the introduction of new products and services to the marketplace, or various custom enhancements and modifications requested by processors such as EVO.  The technical skills necessary to support and maintain these platforms, including making necessary changes to these platforms, are not readily available in the marketplace in large part due to the technical complexities of these platforms and an increasingly smaller workforce skilled in "coding" in the language used in developing these platforms.   Because of the cost and complexity in developing and maintaining these back end platforms and the limited market for such platforms, there are very few stand-alone providers of back end services in the U.S. market today. The Debtor is one such provider.

### EVO's Relationship with the Debtor

12.     On or about June 6, 2008, EVO entered into a Master Technical Solutions Agreement (as amended to date, the "Agreement") with the Debtor.

13.     The Agreement grants EVO a perpetual license for the Debtor's "A360 Platform," a proprietary software platform and related product suite that enables EVO to perform back end settlement services for its merchant customers.

14.     The Agreement also obligates the Debtor to provide (a) ongoing support services, (b) general maintenance, including the periodic releases of mandatory regulatory and Card Scheme compliance updates, and (c) custom modifications and enhancements.

### a.      Support Services

15.     The support services provided by the Debtor are principally used to resolve day-to-day issues which arise in connection with the functioning of the A360 Platform.   Typically, these issues involve correcting non-critical software "bugs" that prevent a certain type of processing activity from processing properly.   When a support issue arises, EVO opens a "Service Ticket" with the Debtor describing the particular issue encountered, as well as its severity and business impact, with the most severe issues being labeled a "Priority 1" problem – a system failure that causes the entire portfolio not to process.   Upon receipt of the Service Ticket, the Debtor undertakes to resolve the issue consistent with its support obligations and proscribed procedures.   The support services provided by the Debtor include the resolution of "processing issues" with the A360 Platform; these issues may occur at any time and could result in EVO not being able to satisfy its obligations to the merchants, the Card Networks or its sponsoring member bank, Deutsche Bank.   Importantly, merchants cannot get paid for the goods and services they sell if the A360 Platform does not work properly.

### b.      General Maintenance

16.     The Debtor's obligation to provide general maintenance under the Agreement includes the obligation to provide periodic software releases of mandatory regulatory and Card Network compliance updates to incorporate updates mandated by the Card Networks.   The Card Networks now require mandatory updates or "releases" four times per year that the Debtor delivers to EVO for EVO to incorporate into the A360 Platform.   The Debtor also provides periodic "revisions" to each published release to resolve any issue associated with the release.   If the Debtor were to fail to provide these releases or subsequent revisions under the Agreement, EVO and its merchants would be exposed to potentially significant damages.   These could include actions by regulators and the Card Networks, including the imposition of significant

fines and other penalties.  The Debtor is scheduled to deliver the fall 2016 compliance release ("Fall Release") on September 14, 2016, a release which EVO has already largely paid for under the terms of the Agreement.

### c.  Custom Modifications and Enhancements

17.    Under the Agreement, at EVO's request the Debtor also provides custom modifications and enhancements to the A360 Platform, which includes the development and implementation of special customized processing programs for EVO such as the ability to process transactions in connection with the American Express Opt Blue Program and specialized card brand processing for specific business types such as the parking garage industry.

18.    Additionally, the Agreement obligates the Debtor's to provide general maintenance services.  Under that obligation, the Debtor is required to provide periodic software "releases" that bring the A360 Platform in compliance with new industry regulations or requirements mandated by the Card Networks.  As described above, the Card Networks require "updates" four times per year, and the Debtor is scheduled to deliver the Fall Release  September 14, 2016.

### The Migration of EVO's U.S. Merchant Base to the A360 Platform

19.    The A360 Platform constitutes the most critical technology element of the processing services that EVO provides and the continued functionality of the A360 Platform is an absolute necessity to enable EVO's merchant base to transact business throughout the United States.

20.    Over the last eight years, EVO has paid the Debtor approximately $7 million relating to the A360 Platform, including payments for license fees, custom modifications, enhancements, and ongoing maintenance and support.  In addition, EVO has invested significant

additional sums in both internal and external resources relating to the A360 Platform. EVO made these investments in the A360 Platform in reliance on the Debtor's continued performance of its obligations under the Agreement.

21.     On April 30, 2016, with the Debtor's knowledge and participation, EVO converted more than 160,000 U.S. merchants to the A360 Platform from a platform provided up to that point by a third party.  EVO migrated its U.S. merchant base to the A360 Platform in direct reliance on the Debtor's continued performance of its obligations under the Agreement.

22.     Given its inherent complexities, the conversion process required years of effort and millions of dollars of investment by EVO, including millions in fees paid to the Debtor. Today, EVO's entire U.S. business—and the businesses of its merchant customers—depends upon the continued full functionality of the A360 Platform, which cannot be assured absent the Debtor's continued performance under the Agreement, a fact of which the Debtor is well aware.

### *Economic Threats from Defendants*

23.     On August 12, 2016, Mr. O'Brien called Michael Reidenbach, EVO's Worldwide Chief Information Officer.  During the call, Mr. O'Brien stated that West Partners had been investing in PGI for nine years.  He further stated that PGI is organized into four divisions, including the Debtor, and that the Debtor was the only division that is not profitable.

24.     Mr. O'Brien informed Mr. Reidenbach that West Partners, as owner of PGI, wanted to sell the Debtor to the "highest bidder."  Mr. O'Brien stated that West Partners had a potential buyer, which Mr. O'Brien characterized as "goofy" and someone EVO "would not like."

25.     Mr. O'Brien asserted that either the sale would be completed with the potential buyer by the end of the following week, or West Partners would place the Debtor into

bankruptcy.  Mr. O'Brien informed Mr. Reidenbach that if the Debtor went into bankruptcy, the Agreement between the Debtor and EVO would be "null and void," such that EVO would not receive any further support services ("if you call we will not pick up the phone"), and that EVO would not receive any software releases going forward, including the Fall Release.

26.     When Mr. Reidenbach asked if there were any other options available to EVO, Mr. O'Brien responded that EVO could either: (a) purchase the Debtor for $48 million; or (b) "tear up" the existing Agreement and enter into a new contract that would pay the Debtor $9 million per year for at least ten years (by way of comparison, EVO projects that under the Agreement it will pay the Debtor aggregate fees of approximately $1.2 million in 2016).

27.     Upon information and belief, Mr. O'Brien made similar threats to some of the Debtor's other customers who have similar contracts with Debtor.

28.     EVO became gravely concerned and insecure as to the Debtor's continued performance under the Agreement.  By letter to Debtor's counsel dated August 17, 2016, EVO demanded that Debtor provide adequate assurances that it will continue to fully perform its obligations under the Agreement.

29.     Debtor did not respond to EVO's August 17 letter and instead filed its Chapter 11 petition later that day.

### The Bankruptcy Case

30.     On August 17, 2016 (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

31.     The Debtor also filed the a motion to reject the Agreement with EVO on the Petition Date (the "Rejection Motion").

32.    The Debtor's Rejection Motion asserts:

a.    The Debtor has contracts similar to the Agreement with three other customers.

b.    The Debtor has been unable to generate a profit on these contracts for the last four years.

c.    The Debtor's sole creditor is its parent company, PGI.

d.    PGI funds the Debtor's operations and employees the approximately 25 professionals who conduct the Debtor's business.

33.    The Debtor filed similar motions (collectively, the "Rejection Motions") seeking rejection of contracts with TransFirst, LLC ("TransFirst"), First American Payments Systems, L.P. ("FAPS"), and Worldpay, US, Inc. ("Worldpay").

34.    On August 24, 2016, EVO, along with TransFirst, FAPS, and Worldpay (collectively the "Resisting Parties"), filed a Joint Motion to Continue Hearing, For a Progression Order, and to Present Oral Testimony (the "Continuance Motion").  The Resisting Parties requested that the Court permit them to conduct discovery pertaining to the Rejection Motions and continue the hearing on the Rejection Motions until a date after discovery had concluded.

35.    The Court held a hearing on the Continuance Motion on August 25, 2016.

36.    During the hearing, counsel for the Debtor asserted that it would be a burden for the Debtor to continue performing under the Agreement with EVO and its contracts with the other Resisting Parties.  The Debtor's counsel initially claimed the Debtor was losing $1 to $2 million per year.  Later in the hearing, however, Debtor's counsel reported that the Debtor incurred $4 million in expenses last year.  Upon information and belief, the Debtor generates

approximately $3.1 million in revenues from its contracts with the Resisting Parties, suggesting that the Debtor's losses, if any, are less than $1 million.

37.    Over the Debtor's objection, the Court granted the Continuance Motion, cancelled a hearing on the Rejection Motions that had been set for September 1, 2016, and set October 12, 2016 as an evidentiary hearing date for the Rejection Motions.   The Debtor's counsel asked if the Debtor could be excused from performing its obligations under the contracts pending the October 12 hearing.   The Court disagreed with this request and instructed that under the circumstances, it was appropriate for the parties to maintain the "status quo" (*i.e.*, continue performing all contractual obligations) until the October 12 hearing on the Rejection Motions.

### The Defendants Decide to Cease Performing Services on August 26, 2016

38.    In contravention of the Court's directive to maintain the "status quo," Mr. O'Brien, a principal of West Partners, and an officer of PGI, and using his West Partners email account, informed EVO on August 26, 2016—within a day of the status hearing—that the Debtor had ceased performing the Agreement.  Specifically, Mr. O'Brien sent the following email:

> **From:** "O'Brien, Dennis M" <dobrien@westpartners.com>
> **Date:** August 26, 2016 at 3:07:57 PM EDT
> **To:** "jeff.rosenblatt@evopayments.com" <jeff.rosenblatt@evopayments.com>
> **Subject: Services from Planet Merchant Processing, Inc.**
>
> This e-mail is to advise you that Planet Merchant Processing has ceased providing all services on your account.  Additionally, this e-mail is to advise you that employees of Planet should not be contacted and any solicitation of employees is prohibited. The Non-Solicitation clause in the contract between your company and Planet Merchant Processing remains in full force and effect, and Planet Merchant Processing will pursue all damages and other relief for any violations of this clause.
>
> All further communications regarding Planet Merchant Processing matters should be made through our bankruptcy counsel, Sam King at the law firm of McGill, Gotsdiner, Workman and Lepp in Omaha, Nebraska.
>
> Dennis O'Brien
> President, Planet Merchant Processing, Inc.

39.    In response to this action, EVO filed its *Verified Emergency Motion for Order to Compel Compliance with Court's Instructions from August 25, 2016 Hearing*.  The Bankruptcy Court granted this motion without a hearing, on August 29, 2016, the same day the motion was filed.

40.    Notwithstanding being specifically ordered to continue performance, the Debtor, acting under the control and, on information and belief, at the specific instruction of O'Brien, PGI, and West Partners, continues to refuse to perform the services required under the Agreement.  Thus, the Defendants have twice defied the authority of the Bankruptcy Court.

41.    The Debtor takes the position that, notwithstanding the Bankruptcy Court's order, the Debtor is not required to provide the *services* required under the Agreement, and is instead only required to provide access to the intellectual property.   This position contradicts the instructions from the Court on August 25, as well as the Court's order of August 29 granting EVO's Motion to Compel – a motion that *specifically* sought to compel the Debtor to continue performance of  its contractual obligations for service and support to EVO.

42.    That the Debtor has, in response to the Bankruptcy Court's August 29 order, allowed access to the Debtor's intellection property, in no way solves the problems or mitigates the risks that were described to the Bankruptcy Court on August 25, and that were set forth in detail in the Motion to Compel.  As such, any purported compliance by the Debtor is illusory and disingenuous.

43.    Despite the Debtor's claims to the contrary, upon information and belief, the Debtor's financial condition does not render it incapable of performing the services it is obligated to provide under the Agreement.

44.     The Debtor has admitted that its goal—and the goal of PGI and West Partners—is to sell the Debtor's business.  The Debtor has no employees and relies solely on employee support supplied by PGI.  Given that the Debtor's business is providing software and support services, it necessarily must retain its ability to provide support services—thus it must retain its access to the employees of its parent.  Similarly, PGI is aware that if it were to terminate these employees to save costs, those employees will be quickly hired by the Debtor's customers—who are now in dire need of the support services that only these specially trained individuals can provide.  For these reasons, these employees will remain employed by PGI, and the cost of retaining them will continue to be borne—either by the Debtor or by PGI.  The cost to retain them is therefore a "sunk cost" and is not an economic impediment to continuing to service EVO's contract and the contracts of the other customers—at least until the October 12 hearing.

45.     Upon information and belief, the Defendants have orchestrated the events set forth in this Complaint in an effort to exert inappropriate economic leverage and to extort payments from, or renegotiation of existing contracts with, the Debtor's existing customers, including EVO, for the benefit of Mr. O'Brien, PGI and West Partners.

46.     The Debtor's actions directly threaten the financial viability of EVO and the businesses of its 160,000 U.S.-based merchant customers.  On information and belief, one of the Debtor's customers, on the same day that Mr. O'Brien ordered the cessation of services to the customers, suffered a $52 million funding shortfall as a result of the Debtor's actions. Moreover, many of EVO's merchant customers are "mom and pop" establishments that rely on receiving their payments through the A360 Platform to maintain their businesses.

47.     It is virtually impossible to find programmers in the marketplace with the skill set necessary to adequately support the A360 Platform.  The A360 Platform is an extraordinarily

13

complex technology solution, which incorporates thousands of routines, fees, and algorithms that directly impact processing activity.  The complexity of the platform, coupled with the fact that the majority of A360 is written in COBOL, an older programming language not used prevalently today, makes the ongoing support services provided by the programmers at the Debtor almost impossible to replicate in the marketplace.  Work on the A360 Platform requires a highly specialized skill set, and programmers that have not previously worked on the A360 Platform simply lack the skills to do so.

48.     As such, the Debtor's refusal to provide support services required by the Agreement has subjected EVO and its merchant customers to the undue risk of a catastrophic system failure.  Without the Debtor's support services, issues that routinely arise in the operation of the A360 Platform will likely cause major failures in EVO's business processes and the ability of EVO's merchant customers to obtain payment for their goods and services.

49.     The Debtor's refusal to provide general maintenance services required by the Agreement also threatens EVO and the businesses of its merchant customers.  Among other things, the Debtor's refusal to provide the Fall Release will prevent EVO from maintaining systems in accordance with the requirements of the Card Networks.  The Fall Release is scheduled to be published by the Debtor to EVO on September 14, 2016.  Representatives from the Debtor have informed EVO that the Fall Release has been completed and is currently undergoing testing through the Debtor's quality assurance process.  Significantly, the upcoming Fall Release will contain the mandatory compliance and regulatory updates mandated by the Card Networks; accordingly, the Fall Release is critical to ensure that the A360 Platform functions properly and in compliance with applicable Card Network rules.  EVO has no other way of implementing the Card Networks' required updates unless the Debtor provides EVO with

14

the Fall Release.  Without the Fall Release, EVO and its merchants will be subject to the risks

noted above.

## COUNT I

## (SPECIFIC PERFORMANCE AS TO THE DEBTOR)

50.     EVO realleges and incorporates the allegations of paragraphs 1 through 49 as

though fully set forth herein.

51.     The Agreement is a valid and enforceable contract between EVO and the Debtor.

The Agreement was made in good faith, its terms are certain, and its provisions are fair.

52.     EVO has complied with—and is ready, able, and willing to continue complying

with—the terms of the Agreement.

53.     The Agreement obligates the Debtor to provide support services and general

maintenance services, which includes the provision of periodic software releases, relating to the

operation of the A360 Platform.

54.     The Debtor breached the Agreement on August 26, 2016, by ceasing to provide

the services required under the Agreement, and continues to breach the Agreement

notwithstanding the August 29, 2016 order of the Bankruptcy Court ordering the Debtor to

continue performing its obligations under the Agreement.   On information and belief, the

Debtor's conduct is being directed and controlled by Mr. O'Brien, PGI and West Partners.

55.     Enforcement of the Agreement would serve the ends of justice and would not

impose substantial hardship on the Debtor because, among other reasons, the Debtor has no

employees and relies solely on employee support supplied by PGI.   On information and belief,

these employees remain employed by PGI, and the cost of retaining them will continue to be

borne—either by the Debtor or by the Debtor's parent—regardless of whether the Debtor provides services under the Agreement.  The cost to retain the employees is therefore a "sunk cost" and presents no economic impediment to continuing to service EVO's contract and the contracts of the other customers.

**WHEREFORE**, EVO respectfully requests the following relief:

A.      An order requiring the Debtor to specifically perform its obligations under the Agreement; and

B.      For such other relief as the Court deems just and equitable.

## COUNT II

### (BREACH OF CONTRACT AS TO THE DEBTOR)

56.     EVO realleges and incorporates the allegations of paragraphs 1 through 55 as though fully set forth herein.

57.     The Agreement is a valid and enforceable contract between EVO and the Debtor.

58.     The Agreement obligates the Debtor to provide support services and general maintenance services, which includes the provision of periodic software releases, relating to the operation of the A360 Platform.

59.     The Debtor breached the Agreement on August 26, 2016, by ceasing to provide the services required under the Agreement.

60.     EVO has suffered damages as a direct result of the Debtor's breach.

**WHEREFORE**, EVO respectfully requests the following relief:

16

A.     An award of damages flowing from the Debtor's breach of contract, to the extent not fully remedied by the Debtor's specific performance of the Agreement; and

B.     For such other relief as the Court deems just and equitable.

## COUNT III

### (VIOLATION OF 11 U.S.C. § 362(a)(3) AS TO PGI AND WEST PARTNERS)

61.     EVO realleges and incorporates the allegations of paragraphs 1 through 60 as though fully set forth herein.

62.     Under 11 U.S.C. § 362(a)(3), a voluntary petition filed under chapter 11 "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

63.     The Agreement constitutes property of the Debtor's estate.

64.     On information and belief, the Debtor's continued failure to perform the Agreement is the result of direct actions by PGI and West Partners.  By interfering with the Debtor's performance of the Agreement and directing and causing its breach, PGI and West Partners acted to "exercise control over property of the estate," in violation of § 362(a)(3)'s automatic stay.

65.     EVO has been damaged by the willful violation of the automatic stay committed by PGI and West Partners.

**WHEREFORE**, EVO respectfully requests the following relief:

A.     An award for damages caused by PGI and West Partner's  violation of 11 U.S.C. § 362(a)(3) to be determined at trial;

B.      A judgment for EVO's costs, expenses, and disbursements, including reasonable

attorneys' fees to the extent permitted by law; and

C.      For such other and further relief as the Court deems just and equitable

## COUNT IV

## (VIOLATION OF 11 U.S.C. § 365(n)(4) AS TO THE DEBTOR)

66.     EVO realleges and incorporates the allegations of paragraphs 1 through 65 as

though fully set forth herein.

67.     When a debtor seeks to reject a contract under which it is a licensor of a right to

intellectual property, 11 U.S.C. § 365 governs the rights of the licensee.

68.     Section 365(n)(4) provides:

Unless and until the [debtor-in-possession] rejects such contract, on the written

request of the licensee the [debtor-in-possession] shall—

A. to the extent provided in such contract or any agreement

supplementary to such contract—

(i)      perform such contract; or

(ii) provide to the licensee such intellectual property (including any

embodiment of such intellectual property to the extent protected by

applicable nonbankruptcy law) held by the [debtor-in-possession]; and

B. not interfere with the rights of the licensee as provided in such

contract, or any agreement supplementary to such contract, to such

intellectual property (including such embodiment), including any right

18

to obtain such intellectual property (or such embodiment) from another

entity.

69.     The Debtor seeks to reject the Agreement under which it is a licensor of a right to

intellectual property and EVO is a licensee.

70.     The Rejection Motion is scheduled for hearing on October 12, and EVO has

requested in writing to the Debtor that Debtor continue performance of the Agreement pending a

determination of the Rejection Motion.

71.     The Debtor has failed to perform under the Agreement and has interfered with the

rights of EVO, in violation of Section 365(n)(4).   Among other things, the Debtor has ceased

providing support services for the A360 Platform and has represented that it will not provide

software releases, including the Fall Release, needed to ensure that the A360 Platform complies

with industry regulations and the requirements of the Card Networks.

**WHEREFORE**, EVO respectfully requests the following relief:

A.     An award for damages caused by the Debtor's violation of 11 U.S.C. § 365(n)(4);

B.     A judgment for EVO's costs, expenses, and disbursements, including reasonable

attorneys' fees to the extent permitted by law; and

C.     For such other and further relief as the Court deems just and equitable.


## COUNT V

## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AS TO PGI, WEST PARTNERS, MR. O'BRIEN)

72.      EVO realleges and incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein.

73.      The Debtor has a valid business relationship with EVO.  Among other things, the Agreement between the Debtor and EVO obligates the Debtor to provide services to EVO relating to the A360 Platform.

74.      PGI, West Partners, and Mr. O'Brien were fully aware of the business relationship between the Debtor and EVO, including Debtor's contractual obligations to EVO under the Agreement.

75.      PGI, West Partners, and Mr. O'Brien intentionally and unjustifiably interfered with the business relationship between the Debtor and EVO.  PGI, West Partners, and Mr. O'Brien attempted to extract exorbitant sums of money from EVO and/or the other Resisting Parties in exchange for permitting the Debtor to continuing performance under the Debtor's existing contracts – with the very real threat of destroying their businesses.  After EVO failed to agree to Mr. O'Brien's demand that EVO purchase the Debtor for $48 million or enter into a new agreement to pay the Debtor $9 million per year for at least 10 years,  PGI, West Partners, and Mr. O'Brien caused the Debtor to initiate bankruptcy proceedings and ultimately cease performing its obligations under the Agreement.

76.      PGI, West Partners, and Mr. O'Brien's improper interference with the business relationship between the Debtor and EVO has resulted in harm to EVO, as well as to the other Resisting Parties, and their customer merchants.

**WHEREFORE**, EVO respectfully requests the following relief:

A.      An award for the damages caused by the Debtor's breach of contract and the other Defendants' intentional interference with EVO's business relationship with the Debtor;

B.      Any other and further relief as the Court deems just and proper; and

C.      For such other relief as the Court deems just and equitable.

## COUNT VI

### (ALTER EGO LIABILITY AS TO PGI, WEST PARTNERS, AND MR. O'BRIEN FOR THE DEBTOR'S BREACH OF CONTRACT AND VIOLATION OF 11 U.S.C. § 365(n)(4))

77.     EVO realleges and incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein.

78.     Mr. O'Brien is president of the Debtor, chairman and/or president of PGI, and a principal and founding partner of West Partners.  The Debtor is a wholly owned subsidiary of PGI and has no employees independent of PGI.  PGI employs all of the individuals who operate the Debtor.  PGI, in turn, is majority-owned by West Partners.  Mr. O'Brien is a principal and founding partner of West Partners.

79.     Upon information and belief, PGI and West Partners—through Mr. O'Brien—exercise complete dominion and control over the Debtor.

80.     Upon information and belief, PGI, West Partners, and Mr. O'Brien have structured the Debtor such that it is grossly undercapitalized and otherwise devoid of economic substance – serving only as a customer-facing façade for the benefit of PGI, West Partners and Mr. O'Brien, that they now conveniently claim lacks the financial wherewithal to continue to perform its obligations to customers.

81.     PGI, West Partners, and Mr. O'Brien used their complete and actual control over the Debtor to engage in an scheme to improperly and unjustly seek to extract an exorbitant sum

of money from EVO and/or the other Resisting Parties and, when their extortive demands were not met, to cause the Debtor to file for bankruptcy and unilaterally terminate its performance under the Agreement, with the full knowledge of the consequences to EVO in doing so.

82.     Upon information and belief, the Debtor's operations are carried on by PGI, West Partners, and Mr. O'Brien in disregard of the Debtor's corporate identity.  PGI and West Partners, through Mr. O'Brien, control every aspect of the Debtor's operations.  Moreover, all of the Debtor's business operations are performed by employees of PGI.

83.     As a result, in accordance with Nebraska law, the Court should find that the Debtor, PGI, West Partners, and Mr. O'Brien are the same entity, notwithstanding the nominal separate identify of the Debtor, for the purposes of determining Defendants' liability.

**WHEREFORE**, EVO respectfully requests the following relief:

A.      A determination that Mr. O'Brien, PGI and West Partners are the alter egos of the Debtor, and that the Debtor's obligations to EVO constitute the liabilities of each of the other Defendants, jointly and severally;

B.      An order requiring PGI, West Partners, and Mr. O'Brien to cause Debtor to specifically perform its obligations under the Agreement.

C.      To the extent not fully remedied by the Debtor's specific performance of the Agreement, an award for all damages to EVO arising from PGI, West Partners, and Mr. O'Brien's actions;

D.      A judgment for EVO's costs, expenses, and disbursements, including reasonable attorneys' fees to the extent permitted by law; and

E.      For such other and further relief as the Court deems just and equitable

## COUNT VII

### (TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION / PERMANENT INJUNCTION AS TO ALL DEFENDANTS)

84.     EVO realleges and incorporates the allegations of paragraphs 1 through 83 as though fully set forth herein.

85.     EVO is likely to prevail on the merits of its claims against the Debtor because the Debtor has expressly notified EVO that it is no longer performing services as required under the Agreement, both in breach of the Agreement and in violation of 11 U.S.C. § 365(n)(4).

86.     EVO is also likely to prevail on the merits of its claims against PGI, West Partners, and Mr. O'Brien because PGI, West Partners, and Mr. O'Brien are liable for their violation of 11 U.S.C. § 362(a)(3).   They are also liable because PGI, West Partners, and Mr. O'Brien intentionally and improperly interfered with EVO's business relations by causing the Debtor to cease performing its obligations under the Agreement.   They are also liable for Debtor's actions as alter egos of the Debtor.

87.     EVO will face irreparable harm without immediate injunctive relief.

88.     The irreparable harm that would result to EVO and its merchant customers in the absence of injunctive relief vastly outweighs the harm, if any, that would result to Defendants from the grant of immediate injunctive relief.   The Debtor has no employees and relies solely on employee support supplied by PGI.   These employees remain employed by PGI, and the cost of retaining them will continue to be borne—either by the Debtor or by the Debtor's parent— regardless of whether the Debtor provides services under the Agreement.   The cost to retain the

employees is, therefore, a "sunk cost" and presents no economic impediment to continuing to service EVO's contract and the contracts of the other customers—at least until the October 12 hearing.

89.     Granting immediate injunctive relief would serve the public interest.  Such relief would permit not only EVO and its 160,000 customer merchants, but also the other Resisting Parties and their additional 440,000 customer merchants, to continue operating their businesses without further disruption.  By contrast, denying such relief would threaten the viability of EVO and the Resisting Parties, while wreaking economic havoc on hundreds of thousands of customer merchants who depend on their payment processing services.

**WHEREFORE**, EVO respectfully requests the following relief:

A.     A judgment granting preliminary and permanent injunctive relief ordering the Debtor to perform all services required under the Agreement for the duration of such Agreement;

B.     A judgment granting preliminary and permanent injunctive relief ordering PGI, West Partners, and Mr. O'Brien to refrain from taking any further action that interferes with the Debtor's performance of all services required under the Agreement;

C.     A judgment for EVO's costs, expenses, and disbursements, including reasonable attorneys' fees to the extent permitted by law; and

D.     For such other and further relief as the Court deems just and equitable.

**DATED** this 30th day of August, 2016.

Plaintiff, EVO Merchant Services, LLC,


By:    /s/ T. Randall Wright
       T. Randall Wright (NE # 16398)
       BAIRD, HOLM LLP
       1500 Woodmen Tower
       Omaha, Nebraska  68102-2068
       402-344-0500
       402-231-8552 (facsimile)
       rwright@bairdholm.com

       and

       KING & SPALDING LLP

       /s/ Paul K. Ferdinands
       Paul K. Ferdinands
       Georgia Bar No. 258623
       pferdinands@kslaw.com
       Mark M. Maloney
       Georgia Bar No. 468104
       mmaloney@kslaw.com
       1180 Peachtree Street
       Atlanta, Georgia 30309-3521
       Telephone:  (404) 572-4600
       Facsimile:   (404) 572-5100

       Its Attorneys

## VERIFICATION

I, Jeff Rosenblatt, declare:

I am President of EVO Merchant Services, LLC, and am authorized to make this verification for and on its behalf.  I declare that I have read the foregoing VERIFIED ADVERSARY COMPLAINT and know the contents thereof.  The facts set forth therein are true of my own knowledge, except as to those matters that are stated on information and belief; and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of August, 2016.

_____
Jeff Rosenblatt
President
EVO Merchant Services, LLC